UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) Cause No. 4:20-CR-00384 HEA/SPM |
| v. | ) |
| NICHOLAS H. HAGLOF, | ) |
| Defendant. | ) |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S MEMORANDUM
IN OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

Comes now, Defendant, by and through counsel and files this response to the Government's memorandum in opposition to the Defendant's motion to suppress, and states as follows:

**The initial five minutes and twenty seconds of Defendant Haglof's interview with Det. Stoehner were custodial and coercive.**

From the beginning, Detective Stoehner and Sergeant Kavanaugh's interrogation of Haglof was custodial. He was called back to the station, and he was escorted into a particular room by his superiors to meet with police detectives. He was seated furthest from the door with the door shut and blocked by Detective Stoehner. The blinds were drawn in the room. Haglof was never left alone. His gun was seized in the Chief's office. He was always under the supervision of law enforcement. Further, he was not allowed to leave nor was he told he was free to leave after he exercised his rights. Actions by law enforcement throughout this interrogation discredit the Government's assertion this was not a custodial setting.

After asking her initial guilt-seeking questions, Detective Stoehner, in the presence of her supervisor, read Haglof his Miranda rights. This act alone would advise an educated law

1

enforcement officer that he was in a custodial interrogation. An officer would know if other police officers were reading him his rights that those officers believe this is a custodial setting. Thus, it can be reasonably inferred that Haglof would believe he is in custody because he had training regarding when Miranda rights were required.

The setting of the interview did not change after five minutes and twenty seconds. The same custodial elements were present in the room. This shows that Detective Stoehner made a calculated decision when she waited to read Haglof his Miranda Rights. She waited until she got the information essential to her search warrant application.

Further, Detective Stoehner and Sergeant Kavanaugh did not go to Haglof's address to interview him after work hours. They did not meet him out on the street and talk to him, nor did they invite him down to the St. Louis County Police Headquarters for an interview. They made a conscience decision to interview Haglof at the Maryland Heights Police station. They chose to interview him while he was on duty when he could not leave because he was there for his shift.

Another indication that this was a custodial setting was that Haglof was never informed of his Garrity protections. *See Garrity v. New Jersey*, 385 U.S. 493 (1967). Garrity warnings are given to officers when there is an administrative or disciplinary action. These warnings are meant to advise an individual that they are under investigation for a violation of departmental rules, that they are obligated to make statements for internal purposes, and that those answers cannot be used against them in a criminal proceeding. *Id*.

For example, these warnings include statements such as:
- I wish to advise you that you are being questioned as part of an official investigation of the Police Department. You will be asked questions specifically directed and narrowly related to the performance of your official duties or fitness for office.

- You are entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate yourself (and to have an attorney of your choice present during questioning).

- I further wish to advise you that if you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to departmental charges which would result in your dismissal from the Police Department.

- If you do answer, neither your statements nor any information or evidence which is gained by reason of such statements can be used against you in any subsequent criminal proceeding. However, these statements may be used against you in relation to subsequent departmental charges.

Because Haglof was not advised of his Garrity rights, he knew this involved something more than an administrative disciplinary issue.

Haglof does not dispute that he has experience reading and understanding *Miranda* rights. Although Haglof has read Miranda warnings to individuals before, this was mainly in the context of simple drug possession or unlawful discharge of a firearm. This previous experience combined with Haglof's assertion of his rights bolsters his position that coercive and deceptive tactics were utilized by Detective Lucca during the non-recorded conversation between the two of them to get him to later waive those rights.

The Government used the employer-employee power dynamic against Haglof by having him first meet with his supervisor, who took away his firearm and escorted him to the room where he would be interrogated. He was not told why Detective Stoehner and Sergeant Kavanaugh were

there, but they immediately began by telling Haglof that his supervisor allowed them to speak with him.

### The search warrant was not based on sufficient evidence independent of Defendant Haglof's statements.

Prior to reading Miranda warnings, Detective Stoehner asked Haglof thirty-eight questions, all within the first five minutes and twenty seconds. Almost every single one led to a response that could be used to show Haglof's guilt. While he was in custody, Haglof gave detectives the vital pieces of information they needed to obtain a search warrant. Haglof disputes that this information was obtained at the same time from his wife. Detective Stoehner did not interview Haglof's wife because she was not there. She used the information she received from Haglof himself to apply for the warrant.

Before the interrogation with Haglof on July 31, 2020, Detectives did not know where he lived for the last several years, what internet provider he used, what devices he had, where he stored any devices, or if he had any additional storage units. The specific ways the police discover a suspect's address, internet provider, etc. are incredibly important in investigations based on internet activity. The CyberTip that is the basis for these charges only identifies an IP address, a string of numbers and letters. To find out whose IP address this was during the relevant time in 2019, the Government had to send a subpoena to Charter communications for that IP addresses' user information.

They also conducted a utilities inquiry for the address. These inquiries led them to four different names – Allison Lehmkuhl, Ashley Kluge, Allison Haglof and Jim Lehmkuhl. They also ended up with three different addresses, one on Brookside Drive, one on Goldwood Drive, and one on Turfwood Drive. The only link to Nicholas Haglof that the police discovered was that he had married Allison Haglof in 2018 and they had purchased the home on Turfwood Drive in 2020.

4

To confirm that Haglof was in fact the suspect and apply for a search warrant, the detectives had to confirm where he lived during the relevant period. They did so by asking him guilt seeking questions in a custodial environment without Mirandizing him, violating his constitutional protections under Miranda.

Trying to get as much information before administering Miranda warnings is a standard practice among police. However, in this case, this practice was used to ask guilt-seeking questions and obtain information necessary to get a search warrant for Haglof's home and electronic devices because there was a reasonable likelihood that he would exercise his rights immediately. If that happened, they would not have enough information for a search warrant. If they had enough before that interrogation, why would this unit not show up with a warrant in hand – which is standard procedure if they have probable cause in the first place.

This police protocol is akin to the one discussed in *Missouri v. Seibert*, 542 U.S. 600 (2004). In that case, another police practice was in question: the intentional decision by police officers to withhold Miranda warnings until after an initial confession, then to read the Miranda warnings and have the subjects repeat themselves. *Id*. The Supreme Court struck down this practice as unconstitutional. *Id*. The deceitful practices employed in this case mimic those discussed in *Seibert*. In both, police used tactics like calculated timing of their reading of Miranda warnings to elicit the information they wanted to ensure it was obtained.

If Detective Stoehner had enough information linking Haglof to these addresses, she would have taken that information from her inquiries and got a search warrant. But, instead, she chose to wait and get statements from Haglof, confirming where he lived, the internet provider he used, if he had storage units, etc. She did this because that information was essential to provide probable

5

cause. Without it, there would not be enough material linking Haglof himself to the particular addresses or the particular internet activity for a search warrant.

This case presents more than a simple failure to administer Miranda warnings, and this failure was accompanied by coercion and other circumstances calculated to undermine the suspect's ability to exercise his free will. *See Oregon v. Elstad*, 470 U.S. 298 (1984). The Government is asking this Court to find the information they had prior to their interrogation of Haglof close enough to meet the probable cause standard. But that is not sufficient. The information illegally obtained from Haglof was the only way that the probable cause standard would have been met.

### **The Defendant's interview with Det. Lucca violated his Constitutional rights as the Defendant did not reinitiate communication with the police on his own volition.**

The second part of this interrogation occurred *after* a significant period where Haglof and Detective Lucca were in a room together, and the conversation was unrecorded. As stated in the original motion to suppress, Detective Lucca used that time where he was not being recorded to build rapport with Haglof and induce him to speak further by commenting on the nature of the case, the publicity it would get, and the uniqueness of Haglof's name. These types of comments have continuously been held to be coercive and lead to a violation of constitutional protections. *See Smith v. Endell*, 860 F.2d 1528, 1533-34 (9th Cir. 1988) (police may not make statements intended to extend a conversation or open up a more generalized discussion relating directly or indirectly to the investigation; *United States v. Foreman*, 993 F.Supp. 186, 192 (S.D.N.Y. 1998) (officer's statement that suspect could do better by speaking with police was the functional equivalent of interrogation); *United States v. Gomez*, 927 F.2d 1530, 1537-39 (11th Cir. 1991) (agent's statements to the suspect, after the suspect asserted his desire to seek counsel, regarding the severity of possible sentence and advantages of cooperation, constituted interrogation in

violation of the suspect's Fifth Amendment rights; agent should have known that his statements were reasonably likely to evoke an inculpatory response); *United States v. DeLaurentiis*, 629 F.Supp.2d 68, 74-75 (D. Me. 2009) (agent's statements, including "you'll be better just to talk to us," were intended to actively dissuade the suspect from contacting a lawyer).

Since Defendant's initial motion, Counsel has received additional discovery, including a transcript of Detective Lucca's Grand Jury Testimony. In that testimony, he admits to speaking with Haglof at length:

> "After he indicated he didn't want to talk, there was a period of time in which he sat by himself – well not by himself. There was a police officer in there, watching him but no one was speaking with him. I went in. I introduced myself to him. He and I spoke for probably about an hour, about just police work, the Maryland Heights police department, things of a nature like that. I told him multiple times he didn't have to talk to me about any aspects of the case. I didn't ask him any guilt seeking questions about the case but through the course of him and I just speaking, at length, he did indicate he wanted to provide his story, his version of events related to this." Tr. 6-7.

Later during Detective Lucca's grand jury testimony, a juror asks him if that part of the conversation is recorded. Detective Lucca states:

> "No. that was not recorded. When I was talking to him, he indicated he did want to, kind of, relay his version of events. I told him, I said, okay. Well, what I'm going to need to do is turn a recorder on. I turned the recorder on." Tr. 9.

There is no reason Detective Lucca should be entering the room engaging Haglof in a conversation. Detective Lucca chose to come into the room and continue conversing with Haglof, knowing he had invoked his rights. Further, Detective Lucca had access to a recorder the entire time, but he chose not to use it. This conduct runs afoul of the cases cited above.

The interrogation and investigative strategies utilized in this case are obvious attempts to skirt Haglof's protections under Miranda. More and more, the police are using methodical strategies in attempts to thwart Miranda, banking on technicalities to support their actions.

7

Allowing the behavior in this case to go unaddressed would go against the foundational principles that led the Supreme Court to decide Miranda in the first place. Detective Stoehner and Detective Lucca's purposeful methods during this interrogation were a deliberate end run around Miranda's protections, and therefore the statements and physical fruits should be suppressed.

WHEREFORE, Defendant requests an order of this Court sustaining his Motion to Suppress Statements and suppressing the Physical Fruits of the Unlawfully Obtained Statements.

Respectfully submitted,

FRANK, JUENGEL & RADEFELD,
ATTORNEYS AT LAW, P.C.

By /s/ Daniel A. Juengel
DANIEL A. JUENGEL (#42784MO)
Attorneys for Defendant
7710 Carondelet Avenue, Suite 350
Clayton, Missouri 63105
(314) 725-7777

**CERTIFICATE OF SERVICE**

I hereby certify that on October 7, 2021, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following.

Jillian Anderson
Asst. United States Attorney
111 South Tenth Street, 20th Floor
St. Louis, Missouri, 63102

/s/ Daniel A. Juengel
DANIEL A. JUENGEL